## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JONNIE H. WHITE**,

    **Petitioner,**

    **v.**

**UNITED STATES OF AMERICA,**

    **Respondent.**

       **CASE NO.    2:10-CV-070**
       **CRIM. NO.   2:05-CR-174**
       **Judge Algenon L. Marbley**
       **Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

The Court conducted an evidentiary hearing on Petitioner's claim that he was denied effective assistance of counsel during plea negotiations. The parties have filed supplemental briefing. For the reasons that follow, the United States Magistrate Judge **RECOMMENDS** that the motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 be conditionally **GRANTED** on Petitioner's claim that he was denied effective assistance of counsel during plea negotiations. Further, the Magistrate Judge **RECOMMENDS** allowing the Government thirty (30) days to re-offer Petitioner the opportunity to enter a guilty plea under the terms of the March 22, 2006 *Plea Agreement* and to set the case for a re-sentencing hearing.[1]

---

[1] This recommended remedy flows from the case of *Titlow v. Burt*, 680 F.3d 577 (6th Cir. 2012). The Government challenged this remedial scheme on appeal in the Supreme Court as inconsistent with *Lafler v. Cooper*, 132 S.Ct. 1376 (2012). The Supreme Court, however, did not reach the issue of "whether the Sixth Circuit's remedy is at odds with [its] decision in *Lafler . . . .*" *Burt v. Titlow*, No. 12-414, --S. Ct. -- , 2013 WL 5904117, at *7 n.3 (U.S. Nov. 5, 2013). Although the Supreme Court reversed the Court of Appeals on the issue of whether counsel's representation had been ineffective, it left the directive to consult the plea agreement and resentence undisturbed.

1

**INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

Petitioner contends he was denied effective assistance of counsel because of his attorneys' performance during the plea-negotiation stage of the criminal proceedings. Petitioner asserts that he would have pleaded guilty but if attorneys had advised him. He explains that his counsel failed to advise him of the unlikelihood of obtaining an acquittal or the potential sentencing ramifications he faced. Petitioner adds that his counsel further failed to explain to him that he could contest the amount of drugs being attributed to him. Petitioner asserts that his third attorney, Thomas Warshaw, failed to negotiate a plea agreement on his behalf or file a motion to have his previously entered plea of guilty reinstated.[2] According to Petitioner, he told Attorney Warshaw he wanted to plead guilty under the terms of the prosecution's second plea offer and did not want a jury trial. Petitioner maintains that Mr. Warshaw failed to pursue a plea agreement and instead advised him he had a good case for a trial. Petitioner contends that as a result, he was sentenced to a greater term of incarceration that he would have received had he entered a guilty plea.

**I.**

The Court has already detailed many of the facts and procedural history of this case in the *Report and Recommendation* of October 26, 2011. (ECF No. 157.) Relevant facts are repeated here. The United States Court of Appeals for the Sixth Circuit summarized these facts and the procedural history of this case as follows:

> White was convicted by a jury on June 14, 2006, of conspiracy to distribute and possess with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. § 846, and possession with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) and 18 U.S.C. § 2, based on his activities in the Southern District of

---

[2] As will be discussed more fully below, Petitioner never successfully entered a plea of guilty despite two separate attempts.

Ohio in 2005. On October 13, 2006, White was sentenced to 293 months in prison, five years supervised release and a $200 special assessment.

A. Pretrial Proceedings

White retained three attorneys during the proceedings and attempted to plead guilty twice. White's first plea agreement was filed with the district court on February 16, 2006. In that agreement, White agreed to plead guilty to the conspiracy count and further agreed that the relevant conduct attributable to him as part of the conspiracy was 486.69 grams of cocaine base. This agreement also stated the government's position that White should receive a two-level enhancement for possession of a firearm in connection with the drug conspiracy pursuant to U.S.S.G. § 2D1.1(b), a two-level enhancement for possession of a firearm in connection with the drug conspiracy pursuant to U.S.S.G. § 2D1.1(b), and a two–level enhancement for having a supervisory role in the conspiracy pursuant to U.S.S.G. § 3B1.1. White reserved the right to contest those enhancements at the sentencing hearing. Finally, the plea agreement provided for a potential reduction of three offense levels for acceptance of responsibility, provided he continued to accept responsibility through sentencing.

On February 28, 2006, at the change of plea hearing, White indicated that he did not wish to go through with his guilty plea, and the written plea agreement was withdrawn. White's trial was rescheduled for April 10, 2006.

On March 22, 2006, a second plea agreement was filed. In this second agreement, White agreed to plead guilty to the conspiracy count, and agreed that the relevant conduct was 486.69 grams of cocaine base, for an offense level of 34 under the applicable advisory guideline. This time the government did not reserve the right to produce additional evidence concerning relevant conduct or to seek enhancements for possession of a firearm or for a supervisory role.

The change of plea hearing was held the same day. White agreed to enter his guilty plea before the magistrate judge. The magistrate judge refused to accept the guilty plea however, after White indicated that he was "not really" satisfied with counsel's advice and representation because counsel was doing only what the prosecutor told him to do, and that he was pleading guilty because he felt like his attorney was not putting any real effort into

his case and "fighting for my rights." White explained that the government's witness, White's girlfriend and codefendant Shawnda Cordell, would blame him for all of the drugs sold, although she was a known drug dealer before meeting White. White stated that he believed he had "some defenses."

Counsel's motion to withdraw was granted and White retained his third attorney, Tom Warshaw, who was granted leave to appear pro hac vice to represent White for trial.

B. Trial

Trial began on June 12, 2006. Detective Chad Wallace of the Gallipolis, Ohio Police Department testified that on March 25, 2005, he stopped a vehicle driven by White after it failed to stop at three consecutive stop signs. Cordell was a passenger. Wallace knew Cordell was on probation. As part of her probation, she was subject to search at any time. Wallace searched Cordell and the vehicle but found no drugs. Cordell was then transported to her home, 193 Windsor Drive, Gallipolis, Ohio, for a further search. There the officers found 27.44 grams of cocaine base, inside a box which was hidden in a large bag of dog food next to the refrigerator. The crack cocaine was packaged in 12 to 13 individual packets. The officers also found a small bag of crack cocaine on top of the refrigerator, a small digital scale, and $14,566 in U.S. currency. No fingerprints were found.

On July 22, 2005, Jerry Abbott, a cooperating informant, made a controlled buy of crack cocaine from Cordell. Cordell confirmed the sale, although she stated that the crack did not come from White, who was in Detroit, but from her cousin.

On July 23, 2005, at 1:30 a.m., Trooper Risner observed a vehicle traveling eastbound on U.S. 35 at an extremely slow speed. He ran a file check on the vehicle and found that it was registered to Cordell. He also determined that Cordell had an outstanding arrest warrant for a probation violation, so he made a traffic stop of her vehicle. Risner took Cordell into custody. White was a passenger. Cordell testified that she was returning with White from Detroit when she was arrested.

The police executed a search warrant on the couple's mobile home located at 2657 State Route 218, Gallia County, Ohio, on July 25, 2005. White and Cordell were present. Officers discovered 486.69 grams of cocaine base in the charcoal grill next to the back porch of the mobile home. The crack cocaine was

4

divided into 23 individual vacuums inside a vacuum sealed package. The officers also found digital scales with crack residue, $3643 in currency, and a 9 mm semiautomatic pistol, with a magazine containing 16 live rounds of ammunition. No fingerprints of any kind were found on the seized evidence.

Cordell, who was charged with White, pleaded guilty and agreed to cooperate in return for a reduced sentence. Cordell testified that she was living with White in the mobile home on July 25, 2005. She said that she had known White since October 2003, and began living with him in December 2003/January 2004. To Cordell's knowledge, White was not employed, and he traveled to and from Detroit to Gallipolis for several weeks at a time in each location.

Cordell stated that after about a year she discovered that White was selling crack. Eventually she began making deliveries of the crack to White's customers. Sometimes a customer would come to one of their residences to pick up the crack.

Cordell testified the $14,566 seized in March 2005 belonged to White and came from drug sales. She testified that the crack in the dog food bag belonged to White, as did the crack in the grill.

Three of White's crack cocaine customers also testified-- Jerry Abbot and his wife Teresa, and John Rees. All three testified that they made numerous purchases from "Cash," or White, or one of his dealers.

On June 14, 2006, the jury found White guilty of one count of conspiracy to distribute cocaine base and one count of possession with intent to distribute cocaine base. The jury answered special interrogatories determining that the quantity of crack cocaine involved in both charges was at least 50 grams of cocaine base. (Id.)

After the jury returned the verdict, White made an obscene gesture at the jury and an obscene remark to the government attorney.

C.   Sentencing

White's presentence report (PSR) set his advisory guideline sentencing range at 292-365 months, based on an offense level of 38 and a criminal history category of III. [FN1] The sentencing

range was based on the relevant conduct of 853.06 grams of cocaine base, which corresponded to an offense level of 36. Added to that was a two-level enhancement of White's supervisory role of Cordell and an unindicted coconspirator known as Greg.

> FN1. The 2005 edition of the U.S. Sentencing Guidelines Manual was used.

> White's criminal history category was the result of one point for his 1997 conviction for speeding, obstruction, no license, giving a false name and false birth date in Cobb County Georgia; two points for a conviction of carrying a concealed weapon in 2001 in Detroit, Michigan; one point for a conviction of providing false information and drug abuse in Gallia County, Ohio; and one point for his conviction for possession of marijuana in 2004 in Gallia County; Ohio. This amounted to five criminal history points, which is a criminal history category III. In addition, the PSR listed numerous other arrests not counted for purposes of assessing criminal history points.

> White filed one objection, related to his criminal history category, and requested a downward departure on the ground that category III over-represented the true nature of his criminal history.

> White did not make any objections at the sentencing hearing to the factual findings in the PSR or to the guidelines range, and the district court adopted both. At sentencing White argued that the offenses were overstated based on the 100/1 crack to cocaine powder ratio and that his criminal history score over-represented the true nature of his past. The district court rejected the latter contention because of White's "rather lengthy criminal past." The court also held that it had discretion to consider the crack/powder cocaine differential, and exercised that discretion, reducing White's advisory guideline range from an offense level of 38 to 36. This reduction decreased Whites' guideline sentencing range to 235 to 293 months. ( *Id.*) After reducing White's advisory guideline range two levels, the court considered the factors outlined in 18 U.S.C. § 3553(a), and sentenced White to 293 months' imprisonment.

*United States v. White*, No. 06-4449, 308 F. App'x. 910, unpublished, 2009 WL 196548, at *1-3

(6th Cir. Jan. 28, 2009).

## II.

The Court conducted an evidentiary hearing at which Petitioner and his former attorney, Thomas Warshaw testified.  The Court sets forth the following summary of the testimony.

### A.  Petitioner's Testimony

Petitioner testified at the hearing that he was represented by Attorney Chris Cooper on February 28, 2006, when he appeared before the District Judge to enter a guilty plea.  According to Petitioner, Cooper merely advised Petitioner that he was facing fifteen years to life. *Evidentiary Hearing Transcript*, PageID #1234.  Petitioner testified that Cooper never discussed with him the precise terms of the plea agreement: "He just told me if I go to trial, I get life or I can plead out to a lesser charge.  He didn't tell me what was actually in the plea."  PageID #1234.  Petitioner represented that when he appeared to enter a plea of guilty pursuant to that plea agreement, counsel advised the Court that Petitioner had changed his mind and did not want to plead guilty.  Petitioner testified that he did not plead guilty "[b]ecause I didn't understand the plea.  I didn't understand what the plea was . . . ."  PageID #1235.  Petitioner indicated, however, that he did actually intend to plead guilty and was trying to "plead to his indictment," which charged his with conspiracy to possess with intent to distribute more than fifty grams of cocaine base.  PageID #1235.

On March 22, 2006, Petitioner appeared before Magistrate Judge Abel for a detention hearing and was denied bond.  When Petitioner returned to the holding cell, Attorney Cooper came to see him and advised him that the prosecutor had extended a new plea offer.  Mr. Cooper, however, did not go over the terms of the new agreement with Petitioner.  PageID #1240. According to Petitioner, he told Attorney Cooper he wanted to plead guilty.  The parties then returned to Magistrate Judge Abel for a change of plea hearing.

Petitioner did not learn of the terms of the second plea offer until he appeared in court to enter his guilty plea. In fact, the first time he saw the plea agreement and signed it was when he returned to Judge Abel's courtroom for the change of plea hearing. PageID #1239. Petitioner indicated he understood that under the terms of the new proposed agreement, the Government would not seek binding enhancements for possession of a firearm or for a supervisory role. PageID #1237. He did not have the opportunity to discuss with Attorney Cooper his concern the amount of drugs involved in the *Plea Agreement*. Still, according to Petitioner, it was his intent at that time to enter a guilty plea under the terms of the March 22, 2006 *Plea Agreement*. PageID #1240.

Magistrate Judge Abel refused to accept Petitioner's guilty plea, however, because Petitioner indicated he was not happy with his attorney. Petitioner admitted his guilt to selling crack cocaine, but disputed the amount of drugs being attributed to him: "I wanted to plead guilty, but I [] felt that the amount – I wasn't guilty of the whole amount. But like I told Mr. Cooper as well as [Judge] Marbley. . . I am guilty. . . of selling drugs. . . But I was trying to plea[d] to my indictment. I didn't want to plead to everything they was trying to put on me like as far as the amount." PageID #1238. Petitioner explained that he "wanted to plead out to the conspiracy, to the 50 grams, and they were still trying to put the 489 on me." PageID #1239. He agreed as far as the minimum fifty grams but had some confusion and concern over the 489 grams.[3] *Id*.

―――――――――――――

[3] The actual amount of relevant conduct attributable to Petitioner in the March plea agreement was 486.69 grams of cocaine base. More specifically, the relevant terms of the March 22, 2006 *Plea Agreement* indicate that Petitioner would plead guilty to Count 1 of the Superseding Indictment, charging him with conspiracy to distribute more than 50 grams of crack cocaine. Again, the parties agreed that Petitioner was responsible for 486.86 grams of crack cocaine, corresponding to an offense level of 34 under the United States Sentencing Guidelines. In this Agreement, the Government did not reserve the right to adduce additional evidence of relevant conduct beyond the 486.86 grams. The parties, however, understood that the agreements were not binding and the final determination regarding the amount of cocaine base would be decided by the Court. The parties

Attorney Cooper subsequently moved for and was permitted to withdraw.  After Attorney Cooper withdrew as counsel of record, Petitioner's family hired Attorney Thomas Warshaw, who resided in Michigan.  PageID #1241.  Petitioner was incarcerated in Pickaway County, Ohio.  PageID #1242.  Petitioner testified that Attorney Warshaw advised him that he had a good chance of winning the case.  PageID #1245.  According to Petitioner, he relied on this advice. PageID #1246. Petitioner recalls that Attorney Warshaw visited him only once between April 18, 2006 when the Court permitted his admission *pro hac vice* and June 12, 2006 when trial began:

> He came to see me.  We did the meet and greet thing.  He let me know he was my attorney.  He asked me a few questions.  And I told him. . . "I don't want to go to trial.  I'm not trying to go to trial.  And could you go to Ms. Hahnert [the prosecutor] and see if the plea is still on the table?"
>
> That's when he started telling me about my case.  And basically he was saying that the government only has one key witness, which is your girlfriend, Shawnda Cordell, my codefendant.  She is on six counts.  You're only on two counts.  They found the drugs at her house, and she is the one selling drugs to all the CIs, so the jury is going to see that, that she's trying to get all the. . . focus put it on me, to save herself.  The jury will see that by her having all the counts and facing all the charges.  And that also he was going to call a crooked cop to the stand, and the jury tend to hate crooked officers.
>
> . . . I didn't know nothing about the law.. . . so I took his word.

PageID #1243.  During the trial, the police officer referred to by defense counsel "was found to be very clean and reinstated with back pay and everything."  PageID #1244.  Attorney Warshaw

---

agreed that Petitioner's offense level would not be increased two levels for use of a firearm under U.S.S.G. § 2D1.1(b).  Additionally, the parties agreed that Petitioner had neither a supervisory role nor a minimal role in the offense charged.  The parties acknowledged that the final determination on these matters would be made by the Court.  Petitioner would obtain a three level reduction in his recommended sentence for acceptance of responsibility and timely notifying the authorities of his intent to plead guilty.  Petitioner agreed to forfeiture of the firearms located in his home.  *Plea Agreement*, March 22, 2006 (ECF No. 59, PageID #220-226).

never advised Petitioner as to whether he should accept the terms of the prosecutor's prior plea offer or proceed to trial.

> I don't even know how I got that far for me to go to trial being that I was admitting guilt from day one. I admitted I was guilty to Judge Abel and to Judge Marbley. I don't understand how I got that far. But when it was time for me to go to trial, I basically had to dispute everything because I listened to my attorney, listened to the advice my attorney gave me, and we went off of that.

PageID #1246. Petitioner had no money to hire another attorney. PageID #1247. According to Petitioner, he told Judge Marbley immediately prior to trial that he wanted a trial because he had no money to hire another attorney and was afraid the Judge might become angry or recuse himself from the case. PageID #1250. Petitioner knew he faced fifteen years to life, which was why he wanted to plead guilty. PageID #1250. He wanted to plead guilty to the Superseding Indictment, however, which charged him with intent to distribute over fifty grams of crack cocaine. PageID #1250-51. Petitioner never indicated to the Court, at trial or at his sentencing hearing, that he had wanted to plead guilty. PageID #1254. At sentencing, the District Court determined that 853 grams of crack cocaine should be attributed to Petitioner.[4] PageID #1257.

**B.**  Attorney Warshaw's Testimony

Attorney Thomas Warshaw testified at the evidentiary hearing that he was admitted to the practice of law in 1973. He had worked as a criminal defense attorney since that time, practicing in both state and federal court. PageID #1258-59. Petitioner's family hired Attorney Warshaw to represent Petitioner. PageID #1259. According to Warshaw, he met with Petitioner "a couple of times." PageID #1260. He testified that he obtained and reviewed with Petitioner "a tremendous amount of discovery." PageID #1260.

---

[4] The police recovered $14,566 with other drugs in the car in which Petitioner was driving at the time of his arrest. The Court converted the $14,566 to an amount of crack cocaine and attributed 340.2 more grams to Petitioner based on the conversion.

> [W]e discussed the case. . . I believe he was dissatisfied because he thought [his prior attorneys] wanted him to plead out on the case. And so with that predicate going into the case, I know that he's not really amenable to a plea. But of course it's still my job to let him know what. . . he is looking at in terms of a plea and if ultimately found guilty. And he was given that information.

PageID #1260-61. With respect to whether he advised Petitioner as to the sort of time he would get if he was willing to plead guilty, Mr. Warshaw indicated that he had given him the "[b]allpark area . . . If he went to trial and he was found guilty, the time would be significantly more." PageID #1261. Warshaw denied advising Petitioner to go to trial.

> I never tell anybody what they should do. My job is to counsel them and let them know all the options available to them. Of course, in his case, he had already fired two prior lawyers because of the plea blowing up. So when I was retained in on the case, I had the idea that he wanted to try the case. And he never at any time told me he did not want to try the case.

PageID #1261-62. Warshaw testified that Petitioner never indicated he wanted to enter a guilty plea. Warshaw did not approach the prosecutor to attempt to reinstate the terms of the March 22, 2006 *Plea Agreement*. PageID #1262. Warshaw could not recall any details regarding allegations that had been made against one of the police officers involved in the case. PageID #1263-64. He did not recollect calling this police officer as a defense witness or telling Petitioner that jurors hate corrupt cops. PageID #1264. He did not specifically recall that the officer had been exonerated. Warshaw did not retain copies of his criminal files for more than five years, and no longer had any records of this case with which to refresh his memory. PageID #1265. Warshaw did recall that Petitioner insisted on proceeding to trial. *Id*. Warshaw spoke with Latoya Ballou, Petitioner's niece, who hired him to represent Petitioner. PageID #1265-66.

After reviewing discovery, Warshaw felt the Government had a significant amount of evidence establishing Petitioner's guilt. PageID #1267. He did not, however, at any time

discuss with Petitioner the substantial evidence of guilt against him.  *Id.*   Warshaw testified that

he did not discuss the evidence against him because Petitioner had twice previously attempted to

enter a guilty plea and never at any time led him to believe he wanted to enter a guilty plea in

lieu of going to trial.  Warshaw explained his recollections:

> [H]e was depending on my skill, I think, to win the case. . . .
> Rarely have I seen a federal case where they don't have a lot of
> evidence against your client.  When they indict your client, they
> usually have a very solid case. . . . I have won trials that I didn't
> expect to win.  I've lost trials that I thought were obvious winners.
> All I can do is give all the information to my client and let him
> make the decision.

PageID #1267-68.  Warshaw did not speak with the Assistant United States Attorney regarding

the possibility of a plea offer.  He guessed that this was because he was pretty well certain

Petitioner wanted a trial.  *Id.*   He also thought that sentencing numbers would have been

significant in terms of a plea and that was why the prior attempts to plead guilty had been

unsuccessful.  PageID #1268.  He had never had a case where he had been able to change a

client's mind regarding entering a guilty plea or proceeding to trial after speaking with the

defendant's family.  PageID #1269.  Warshaw did not discuss possible plea negotiations with the

family because, according to Warshaw, Petitioner's niece, who was in constant contact with

Petitioner, knew Petitioner wanted a trial.  *Id.*   Warshaw said it was not even worth discussing

possible plea negotiations with the family.  *Id.*   In terms of discussing a potential plea agreement

with Petitioner, Attorney Warshaw testified that Petitioner "was aware of the numbers that he

would be looking at if he pled guilty and he was aware of the numbers that he was probably

looking at if he went to trial."  PageID #1270.

> Q:     Mr. White signed an affidavit in this case. . . [stating] that
>         he wanted you to go to Robyn Hahnert, the U.S. attorney,
>         and plead guilty.  Do you recollect that?

> A.    No.  That's a fabrication.
>
> Q.    So you actually never discussed, to your knowledge, plea agreements or plea negotiations with Robyn Hahnert?
>
> A.    I don't believe so.  And that's because he wanted to go to trial.

PageID #1273-74.  Mr. Warshaw could not recall the theory of Petitioner's defense.

### III.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them.  *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984).  When assessing counsel's performance under *Strickland*, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690.  "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ."  *Burt v. Titlow*, --- S.Ct. ---, 2013 WL 5904117, at *7 (U.S. Nov. 5, 2013).  In determining whether counsel violated a defendant's Sixth Amendment right to effective assistance, the *Strickland* test requires the Court to engage in a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland*, 466 U.S. at 687.

The right to effective assistance of counsel extends to the plea-bargaining process during which all criminal defendants are "entitled to the effective assistance of competent counsel."  *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012) (internal quotation marks omitted); *see also Missouri v. Frye*, 132 S.Ct. 1399, 1407 (2012) ("In today's criminal justice system . . . the

negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical

point for a defendant.")

> Defendants have a constitutional right to effective assistance of
> counsel during plea negotiations. *Hill v. Lockhart*, 474 U.S. 52,
> 58–59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The two-prong
> ineffective assistance of counsel analysis that the Supreme Court
> announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct.
> 2052, 80 L.Ed.2d 674 (1984), applies to claims that counsel's
> performance was constitutionally deficient during plea
> negotiations. *Hill*, 474 U.S. at 58, 106 S.Ct. 366, 88 L.Ed.2d 203.
> A petitioner who claims that he was denied effective assistance of
> counsel with regard to whether or not to plead guilty must prove
> that (1) counsel rendered constitutionally deficient performance,
> and (2) there is a reasonable probability that but for counsel's
> deficient performance, the petitioner would have pled guilty.
> *Magana v. Hofbauer,* 263 F.3d 542, 547–48 (6th Cir. 2001) (citing
> *Turner v. Tennessee,* 858 F.2d 1201, 1206 (6th Cir. 1988)). "A
> reasonable probability is a probability sufficient to undermine
> confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct.
> 2052, 80 L.Ed.2d 674.

*Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005).  A defendant challenging his

attorney's conduct during the plea-bargaining stage bears "a heavy burden."  *Whiting v. Burt*,

395 F.3d 602, 617 (6th Cir. 2005).  He "must show that counsel did not attempt to learn the facts

of the case and failed to make a good-faith estimate of a likely sentence."  *Short v. United States*,

471 F.3d 686, 692 (6th Cir. 2006) (internal quotation marks omitted).  As the the Sixth Circuit

has emphasized, however:

> The decision to plead guilty-- first, last, and always-- rests with the
> defendant, not his lawyer. Although the attorney may provide an
> opinion on the strength of the government's case, the likelihood of
> a successful defense, and the wisdom of a chosen course of action,
> the ultimate decision of whether to go to trial must be made by the
> person who will bear the ultimate consequence of a conviction.

*Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003).  "On the other hand, the attorney has a

clear obligation to fully inform her client of the available options."  *Id*.  "The duty of defense

14

counsel to consult is paramount when a client has to decide whether or not to waive a constitutional right, such as the right to trial." *Miller v. Straub*, 299 F.3d 570, 580 (6th Cir. 2002).

The Sixth Circuit has described the obligations of defense counsel as it relates to advice during the plea negotiations stage as follows:

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available. In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time.

*Smith*, 348 F.3d at 553 (citation omitted); *see also Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003) (holding that failure of defense counsel to "provide professional guidance" regarding a defendant's sentencing exposure may constitute deficient assistance).

Closely associated with the duty to inform the client of available options is the attendant obligation of conducting "reasonable investigations or [reaching] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "Counsel cannot responsibly advise a client about the merits of different courses of action, [and] the client cannot make informed decisions . . . unless counsel has first conducted a thorough investigation . . . ." *Dickerson v. Bagley*, 453 F.3d 690, 694 (6th Cir. 2006). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "It is not reasonable to refuse to investigate

when the investigator does not know the relevant facts the investigation will uncover." *Dickerson*, 453 F.3d at 696. If an attorney's "failure to investigate does not reflect sound professional judgment," deference to the attorney's purported strategic choices is "not appropriate." *Dando v. Yukins*, 461 F.3d 791, 799 (6th Cir. 2006).

## IV.

Respondent contends that Petitioner has failed to establish his attorney performed in a constitutionally ineffective manner during the plea negotiations. In view of the record, this Court does not agree. The record in this case reveals that Petitioner received little to no advice regarding the decision to accept or reject the Government's proposed plea bargain. Petitioner's testimony that his prior attorney, Mr. Cooper, never fully advised him of the terms of the proposed agreements is undisputed. Moreover, with respect to Mr. Warshaw, the record contains the following evidence concerning his counsel and advice regarding whether Petitioner should proceed to trial and his potential sentence exposure:

- Warshaw met with Petitioner "a couple of times." PageID #1260.

- "But of course it's still my job to let him know what . . . he is looking at in terms of a plea and if ultimately found guilty. And he was given that information." PageID #1260-61.

- With respect to whether he advised Petitioner as to the sort of time he would get if he was willing to plead guilty, Mr. Warshaw indicated that he had given Petitioner the "[b]allpark area . . . If he went to trial and he was found guilty, the time would be significantly more." PageID #1261.

- After reviewing discovery, Warshaw felt the government had a significant amount of evidence establishing Petitioner's guilt. PageID #1267. He did

16

not, however, at any time discuss with Petitioner the substantial evidence of guilt against him.  *Id.*

- Warshaw did not speak with the Assistant United States Attorney regarding the possibility of a plea offer.  He guessed that this was because he was pretty well certain Petitioner wanted a trial.  PageID #1268.

- Petitioner "was aware of the numbers that he would be looking at if he pled guilty and he was aware of the numbers that he was probably looking at if he went to trial."  PageID #1270.

The record reflects that Petitioner signed two plea agreements that advised him of the potential maximum sentence he faced under the terms of a guilty plea, both of which indicated he faced a mandatory minimum term of ten years of incarceration and a maximum term of life imprisonment.  The Court, however, has no doubt that Petitioner received little to no substantive or qualitative advice regarding the potential penalties under a plea agreement versus going to trial.  Clearly, Petitioner did not understand how the drug amounts and relevant conduct impacted his potential sentence under the plea compared to if he went to trial and was convicted.

At best, according to Warshaw, Petitioner was "given information," knew "the ballpark," and "was aware of the numbers" regarding "what he was looking at" in terms of a plea or if he was found guilty at trial.  The Court questions how Attorney Warshaw could advise Petitioner regarding any "numbers" that might apply to a potential plea when he never once spoke to the Assistant United States Attorney regarding the possibility of a renewed or revised offer.  In any event, the record contains no evidence suggesting that Petitioner received advice, guidance or counsel regarding the sentencing ramifications upon conviction of all charges in the indictment versus the benefits of a plea bargain.  The failure of defense counsel to "provide professional

guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance."  *Moss*, 323 F.3d 445 at 474; *see also Smith*, 348 F.3d at 554-55 (holding that defendant entitled to evidentiary hearing regarding whether his defense counsel performed ineffectively by failing to provide professional guidance regarding his sentence exposure when he rejected the government's plea offer).

Equally troubling, the record also indicates that Petitioner's attorneys never discussed with Petitioner the precise terms of the Government's March 22, 2006 *Plea Agreement*, the strength of the Government's case against him, and the advisability of proceeding to trial in view of substantial evidence of guilt regardless of, or despite Petitioner's disagreement with the amount of drugs attributable to him.  Attorney Warshaw, who was the third attorney to represent Petitioner in this case, simply proceeded on the assumption that he had been hired because Petitioner wanted a jury trial, had no interest in a guilty plea, and had fired prior counsel who wanted him to plead guilty.  He spoke once, maybe twice, to Petitioner before the trial. "Regardless of whether a defendant asserts her innocence (or admits her guilt), her counsel must 'make an independent examination of the facts, circumstances, pleadings and laws involved and then . . . offer his informed opinion as to what plea should be entered."  *Titlow*, 2013 WL 5904117, at *7 (Sotomayor, J., concurring) (quoting *Von Molke v. Gillies*, 332 U.S. 708, 721 (1948)).  Petitioner's counsel never provided such an opinion.

Moreover, Warshaw acknowledged that the prosecution had substantial evidence reflecting Petitioner's guilt.  Yet, he never discussed with Petitioner the strength of the Government's case against him, the potential sentence that he faced, or the benefits and detriments of entering a guilty plea under these circumstances.  Without such advice, Petitioner could not make an informed decision regarding whether to proceed to trial or accept the terms of

the government's offers to plea.  Although Warshaw assumed Petitioner did not want to plead guilty and wanted to go to trial, "a lawyer must abide by his client's decision in this respect only after having provided the client with competent and fully informed advice, including an analysis of the risks that the client would face in proceeding to trial."  *Id*.  Defense counsel must conduct a reasonable investigation in order to "responsibly advise a client about the merits of different courses of action" thereby allowing the defendant to make an informed decision regarding the options available to him.  *Smith*, 348 at 587 (citation omitted).  Without such a discussion, an attorney does not perform in a constitutionally effective manner during the plea negotiations phase of trial.   Because the record demonstrates counsel failed to give material advice, Petitioner has demonstrated that his attorneys performed deficiently.  *Titlow*, 2013 WL 5904117 at *6 (noting to demonstrate ineffective assistance defendant must show that counsel gave incorrect advice or "failed to give material advice") (quoting *Titlow v. Burt*, 680 F.3d 577, 595 (6th Cir. 2012) (Batchelder, J., dissenting).

> "The Sixth Amendment does not require that counsel provide an absolutely correct assessment of the comparative risks of a guilty plea versus a trial, but the Supreme Court has "recognize[d] that counsel must at least be aware of such risks, especially where the lack of awareness directly impacts the reasoning behind whatever advice is provided." *Miller*, 299 F.3d at 584 (Gilman, J., concurring) (emphasis added) (discussing *McMann v. Richardson*, 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).

*Titlow v. Burt*, 680 F.3d at 587 (noting that "the State's evidence . . . clearly would have had (or clearly should have had) a major impact on [defense counsel's] advice during plea negotiations."), *rev'd on other grounds*, *Titlow*, --- S.Ct. ---, 2013 WL 5904117.  Here, defense counsel could not adequately advise Petitioner regarding his potential sentencing exposure or the reasonableness of the Government's plea offer without also advising Petitioner of the strength of the Government's case against him or his likelihood of success at trial.

Thus, this Court concludes that Petitioner has established his counsel performed ineffectively under the first prong of *Strickland*. The Court therefore need not resolve factual disputes presented regarding whether Petitioner requested counsel to pursue a plea agreement on his behalf or whether he explicitly advised his attorney that he wanted to enter a guilty plea. Regardless, the Court is unable to conclude based on the record, that defense counsel fulfilled his constitutional obligation of discussing with Petitioner the benefits and detriments of accepting a plea agreement in terms of the weight of the evidence against him, the likelihood of success at trial and the potential sentencing ramifications Petitioner faced under either scenario.

The Court must next consider whether Petitioner has established prejudice. To establish prejudice under the second prong of *Strickland* in the context of a rejected plea offer,

> [A] defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler,* 132 S.Ct. at 1385. The Supreme Court has defined "a reasonable probability," as "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. A reasonable probability is "less than a preponderance of the evidence." *Cornwell v. Bradshaw,* 559 F.3d 398, 405 (6th Cir. 2009). Moreover, "the simple fact of a higher sentence after trial is sufficient to establish prejudice." *Id.* (citing *Lafler,* 132 S.Ct. at 1387 ("[P]rejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence."). A substantial disparity between the plea offer and the post-trial sentence provides evidence that a defendant would have accepted the plea. *Smith*, 348 F.3d at 552.

Petitioner has satisfied this standard.  Respondent acknowledges that Petitioner was subject to a higher sentence by proceeding to trial than he otherwise would have been.  *See Return of Writ*, PageID #1318.  Indeed, Petitioner was convicted on both Counts 1 and 5 of the Superseding Indictment which charged him with conspiracy to distribute and possession with the intent to distribute more than fifty grams of crack cocaine.[5]  Petitioner testified at the evidentiary hearing that he wanted to enter a guilty plea and that he had admitted his guilt throughout the course of the proceeding until he was faced with the trial.  He signed the March 22, 2006 *Plea Agreement*, and admitted his guilt before Judge Abel, but did not understand the amount of drugs that would be attributed to him as relevant conduct because no one spoke to him about it.  Thus, the Court concludes that the record reflects a reasonable probability that, had Petitioner been advised of the strength of the Government's case against him and his sentence exposure under all scenarios, he would have pleaded guilty, as he had twice attempted to do so.  Nothing in the record reflects either that the terms of the March 22, 2006 *Plea Agreement* would have been withdrawn or that the District Judge would have refused to accept the guilty plea.  Petitioner has, therefore, sufficiently demonstrated prejudice from his attorneys' ineffective assistance.

## V.

The question thus becomes one of the proper remedy for a constitutional violation.  Where the charges that a defendant would have been admitted as part of the plea bargain are the

---

[5] Additionally, under the terms of the March 22, 2006 *Plea Agreement*, the parties agreed that Petitioner did not have a supervisory role, that a two-offense level increase for a firearm enhancement would not apply and that Defendant had accepted responsibility.  The Government also agreed that it could only prove independent of Petitioner's proffer that the relevant conduct was 486.69 grams of cocaine base.  While these agreements certainly were not binding on the Court, nothing in the record indicates that the Court would not have accepted these terms of the *Plea Agreement*.  At sentencing, however, Petitioner received an increase for a supervisory role, a firearm enhancement, and of course received no credit for acceptance of responsibility.  Moreover, the Court found Petitioner liable for 853.06 grams of crack as relevant conduct.

same as the charges the defendant was convicted of after trial, "the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between." *Lafler*, 132 S.Ct. at 1389.  As discussed, Petitioner was convicted after a jury trial on both Counts 1 and 5 of the Superseding Indictment.  Had he pleaded guilty pursuant to the terms of the March 22, 2006 *Plea Agreement,* he would not have been convicted of Count 5 and could have received other substantial benefits in his sentencing calculation.   In this situation, the Supreme Court has held that "the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal . . . . The judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Id*.

## VI.

**WHEREUPON,** the Magistrate Judge **RECOMMENDS** that the that Petitioner's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 be **GRANTED** on Petitioner's claim that he was denied effective assistance of counsel during plea negotiations, allowing the Government thirty (30) days to re-offer Petitioner the opportunity to enter a guilty plea under the terms of the March 22, 2006 *Plea Agreement* and set the case for a re-sentencing hearing.

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

 s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge

Date:  November 18, 2013